UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KIRSTEN GISA WILSON,<br><br>          Plaintiff,<br><br>     v.<br><br>MICHAEL J. ASTRUE,<br>Commissioner of Social Security,<br><br>          Defendant. | Case No.: 1:11-cv-01238 - JLT<br><br>ORDER DIRECTING ENTRY OF JUDGMENT IN FAVOR OF DEFENDANT, MICHAEL J. ASTRUE, COMMISSIONER OF SOCIAL SECURITY, AND AGAINST PLAINTIFF KIRSTEN GISA WILSON<br><br>(Doc. 17) |

Kirsten Wilson ("Plaintiff") asserts she is entitled to disability insurance benefits and supplemental security income under Titles II and XVI of the Social Security Act. (Doc. 17) Plaintiff argues the administrative law judge ("ALJ") erred in evaluating the medical evidence. Therefore, Plaintiff seeks review of the administrative decision denying her claims for benefits. For the reasons set forth below, the administrative decision is **AFFIRMED**.

### PROCEDURAL HISTORY

Plaintiff filed an application for disability insurance benefits on December 5, 2008. (Doc. 11-6 at 6- 11). On December 15, 2008, Plaintiff filed an application for a supplemental security income. *Id.* at 12-15. In both applications, Plaintiff alleged disability beginning April 2, 2007. *Id.* at 8, 12. The Social Security Administration denied her claims initially and upon reconsideration. (Doc. 11-4 at 2-34). After requesting a hearing, Plaintiff testified before an ALJ on May 28, 2010. (Doc. 16-3).

1

The ALJ determined Plaintiff was not disabled and issued an order denying benefits on June 23, 2010. (Doc. 11-3 at 7-17). Plaintiff requested review of the ALJ's decision by the Appeals Council of Social Security, which was denied on May 5, 2011. *Id.* at 2-4. Therefore, the ALJ's determination became the decision of the Commissioner of Social Security ("Commissioner").

## STANDARD OF REVIEW

District courts have a limited scope of judicial review for disability claims after a decision by the Commissioner to deny benefits under the Social Security Act. When reviewing findings of fact, such as whether a claimant was disabled, the Court must determine whether the Commissioner's decision is supported by substantial evidence or is based on legal error. 42 U.S.C. § 405(g). The ALJ's determination that the claimant is not disabled must be upheld by the Court if the proper legal standards were applied and the findings are supported by substantial evidence. *See Sanchez v. Sec'y of Health & Human Serv.*, 812 F.2d 509, 510 (9th Cir. 1987).

Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197 (1938)). The record as a whole must be considered, because "[t]he court must consider both evidence that supports and evidence that detracts from the ALJ's conclusion." *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985).

## DISABILITY BENEFITS

To qualify for benefits under the Social Security Act, Plaintiff must establish she is unable to engage in substantial gainful activity due to a medically determinable physical or mental impairment that has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 1382c(a)(3)(A). An individual shall be considered to have a disability only if:

> physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 1382c(a)(3)(B). The burden of proof is on a claimant to establish disability. *Terry v. Sullivan*, 903 F.2d 1273, 1275 (9th Cir. 1990). When a claimant establishes a prima facie case of

disability, the burden shifts to the Commissioner to prove the claimant is able to engage in other substantial gainful employment. *Maounis v. Heckler*, 738 F.2d 1032, 1034 (9th Cir. 1984).

## **DETERMINATION OF DISABILITY**

To achieve uniform decisions, the Commissioner established a sequential five-step process for evaluating a claimant's alleged disability. 20 C.F.R. §§ 404.1520(a), 416.920 (a)-(f). The process requires the ALJ to determine whether Plaintiff (1) engaged in substantial gainful activity during the period of alleged disability, (2) had medically determinable severe impairments (3) that met or equaled one of the listed impairments set forth in 20 C.F.R. § 404, Subpart P, Appendix 1; and whether Plaintiff (4) had the residual functional capacity to perform to past relevant work or (5) the ability to perform other work existing in significant numbers at the state and national level. *Id.* In making these determinations, the ALJ must consider objective medical evidence and opinion (hearing) testimony. 20 C.F.R. §§ 404.927, 416.927.

A.  **Relevant Medical Opinions**

On August 13, 2008, Dr. Murillo completed a psychiatric review technique form and opined there was insufficient evidence to determine Plaintiff's mental impairment. (Doc. 11-8 at 22). Dr. Murillo explained Plaintiff was "failing to cooperate w[ith] disability determination process by not returning necessary forms." *Id.* at 33.

Dr. Shireen Damania performed a consultative examination on February 19, 2009. (Doc. 11-8 at 45-51). Dr. Damania observed Plaintiff demonstrated "an initial period of hostility," but then "was entirely cooperative and pleasant throughout the interview." *Id.* at 46. According to Dr. Damania, Plaintiff's mood "was labile," and she "alternated with depression and tearfulness and at other times she smiled and laughed appropriately." *Id.* at 50. In addition, Dr. Damania observed:

> There was no evidence of a thought disorder. She was oriented to time, place and person. Memory for recent and past recall was intact. Attention span was within normal limits. She had no difficulty concentrating during the course of the interview, although she did indicate that she had "concentration difficulties." She was functioning in the average range of intellectual functioning. … Insight and judgment were fair.

*Id.* at 50. Dr. Damania did not notice any difficulties in concentration, persistence or pace, but opined Plaintiff "would have difficulty concentrating for two-hour increments in a work like setting." *Id.* at

51. Further, Dr. Damania believed that, at the present time, Plaintiff "would have difficulty responding appropriately to coworkers, supervisors, and the public on a consistent basis" as well as "difficulty responding appropriately to usual work situations and dealing with changes in a routine work setting with normal supervision." *Id.* Based upon her assessment, Dr. Damania opined Plaintiff was "able to understand, carryout and remember simple one-and two-step job instructions however not on a consistent basis." *Id.*

On March 11, 2009, Dr. Danilo Lucila opined Dr. Damania's opinion that Plaintiff was unable to sustain simple, repetitive tasks should not be "given great weight" because Plaintiff was able to care for her personal needs, watch television, shop with her spouse, perform calculations, and had a normal attention span and memory. (Doc. 11-8 at 53). According to Dr. Lucila, Plaintiff had mild limitations with her activities of daily living; moderate limitations in maintaining social functioning; and moderate difficulties in maintaining concentration, persistence, or pace. *Id.* at 62. Dr. Lucila noted also Plaintiff had a "lower frustration tolerance." *Id.* at 53. Based upon her observations, Dr. Lucila opined Plaintiff "[w]ould be able to sustain 8 hr/40 hr work schedules on a sustained basis." *Id.* at 67. In addition, Dr. Lucila concluded Plaintiff was able to perform "[simple repetitive tasks] with limited public contact." *Id.* at 53. This assessment was affirmed by Dr. Middleton on June 24, 2009.[1] *Id.* at 74.

Dr. John Middleton, Plaintiff's treating physician, completed a mental capacities assessment on September 14, 2009. (Doc. 11-10 at 41-44). Dr. Middleton explained the effect of Plaintiff's mental impairments on her daily activities as follows: "Patient sleeps poorly, can be tired and unfocused, concentration can be poor. She can be disorganized." *Id.* at 41. In addition, Dr. Middleton explained that Plaintiff "can act inappropriately, be loud, [and] irritable" when her condition worsened. *Id.* According to Dr. Middleton, Plaintiff's ability to adapt to work-like situations was limited because she could "have a labile affect, become irritable, loud, [and] inappropriate." *Id.* Dr. Middleton opined Plaintiff did not have exertional limitations, and could lift up to forty pounds occasionally. *Id.* at 42-43. Plaintiff's medication "could cause dizziness or sedation," but she could occasionally climb, balance, stoop, kneel, crouch, crawl, and reach. *Id.* at 43.

---

[1] It is unclear whether Dr. Middleton is Plaintiff's treating physician or another physician.

**B.     Hearing Testimony**

Plaintiff testified at the hearing before the ALJ on May 28, 2010. (Doc. 16-3 at 2). Plaintiff reported she attended three years of college in paralegal studies. *Id.* at 5. Plaintiff reported she worked as a secretary and technician at Dewey Pest Control. *Id.* at 7. She stated that she "trained about six months" to be a pest technician, and the most weight she had to lift was "about 10, 15 pounds." *Id.* at 8. Plaintiff estimated she worked about 70 percent of the time as a pest technician, and performed clerical work 30 percent of the time at Dewey. *Id.* at 9.

After she was laid off from Dewey, Plaintiff worked as a long-haul truck driver until April 2007. (Doc. 16-3 at 10). According to Plaintiff, she lifted up to 75 pounds while working as a truck driver. *Id.* at 8. Plaintiff said she no longer had a driver's license. *Id.* at 5-6. She explained she lost her Class A license because she was not able to perform her job, and her Class C license was suspended for an unpaid parking ticket. *Id.* at 6. Plaintiff stated that even if she had a license she would not drive because she got claustrophobic and suffered "anxiety attacks." *Id.* at 6-7. In addition, Plaintiff believed she "couldn't function" as a truck driver due to her depression. *Id.* at 8. According to Plaintiff, it was "[i]mpossible" for her to work any job eight hours a day, five days a week due to her COPD, a schizoaffective disorder, "[a]nxiety, hypertension, bipolar . . . [and] insomnia." (Doc. 16-3 at 10). Further, Plaintiff stated she had "body aches and pains" as side effects from her medication. *Id.* at 10-11.

Plaintiff explained she took medication "several times a day" for her hypertension. (Doc. 16-3 at 11). She reported that she had shortness of breath with COPD whenever she had an anxiety attack, which happened "about two or three" times each day. *Id.* Plaintiff stated each attack lasted "about 20, 30 minutes" when she took Ativan. *Id.* at 12. She explained that she would lock herself in a dark room for a couple of hours to relieve an anxiety attack. *Id.* at 13. Plaintiff testified her bipolar disorder caused exhaustion and her "emotions fluctuate[d]" from crying to anger and confusion "within seconds." *Id.* at 13-14, 22.

She described her husband as her "live-in maid," and said she was unable to do much without his assistance. (Doc. 16-3 at 13-14). Plaintiff explained on a typical day she did not get up until 10:00 a.m., and it was "a fight every morning" to get dressed, which her husband told her to do. *Id.* at 14.

She stated she was able to wash herself when her husband "shoves [her] in the shower." *Id.* After a shower, Plaintiff said she usually wanted to go back to bed, where she stayed "[a]t least six hours" each day, for a minimum of two hours each time. *Id.* According to Plaintiff, between the times she rested in bed, she would try to do projects but was unable to finish because she could not focus for more than ten minutes at a time. *Id.* at 16, 19.

Plaintiff testified she felt "closed in" and "claustrophobic around people." (Doc. 16-3 at 18). She explained she felt that way whether in a conference room with three people or in a store like Wal-Mart. *Id.* Plaintiff stated that if she went grocery shopping, her husband would have to get her out of bed at 4:00 a.m. because there would not be anyone in the store. *Id.* at 19.

Plaintiff reported she had a prescription for cannabis for her sleeping problem. (Doc. 16-3 at 20). In addition, she stated she received treatment every two or three months from Dr. Middleton, a psychiatrist, who prescribed her medication. *Id.* at 20-21. Plaintiff believed the medication helped her not "flip-flop as much," but she still had anxiety and hypertension. *Id.* at 21. Although Plaintiff said she never tried to hurt herself, she had suicidal thoughts about once a week. *Id.* at 23.

Vocational expert ("VE") Thomas Dachelet testified after Plaintiff at the hearing. (Doc. 16-3 at 25). The VE characterized Plaintiff's past relevant work under the *Dictionary of Occupational Titles*[2] as follows: the truck driver and pest technician positions were medium work, and the clerk position was light work. *Id.* at 26. The VE explained each of these positions were semi-skilled, with an SVP[3] ranging from 3 to 4. *Id.*

The ALJ asked the VE to consider a hypothetical individual the same age, educational background, and work history as Plaintiff. (Doc. 16-3 at 36). The ALJ specified the individual was "limited to simple and repetitive tasks, with no interaction with the public." *Id.* In addition, the person could have only "limited interpersonal contact on the job . . . on an as-needed basis," but had

---

[2] The *Dictionary of Occupational Titles* ("*DOT*") by the United States Dept. of Labor, Employment & Training Admin., may be relied upon "in evaluating whether the claimant is able to perform work in the national economy. *Terry v. Sullivan*, 903 F.2d 1273, 1276 (9th Cir. 1990). The *DOT* classifies jobs by their exertional and skill requirements, and may be a primary source of information for the ALJ or Commissioner. 20 C.F.R. § 404.1566(d)(1).

[3] SVP," or specific vocational preparation, is defined as the amount of lapsed time required by a typical worker to learn techniques, acquire information, and develop the facility needed for average performance in a specific job position. Employment and Training Admin., U.S. Dep't of Labor, *Dictionary of Occupational Titles*, (4th ed. rev. 1991), page 1009.

no exertional limitations. *Id.* The VE opined such a person could not perform Plaintiff's past relevant work, but was able to perform jobs in the national economy, including "over a million jobs in the light, unskilled laborer market in California." *Id.* at 26-27. As examples, the VE identified the positions of ampoule sealer, linen-supply load builder, hand packager, and poultry worker. *Id.* at 27-28.

Next, the ALJ asked the VE to consider a person "limited to one to two-step tasks," in addition to the above limitations. (Doc. 16-3 at 29). The VE explained the number of jobs available "reduce[d] dramatically," but there were still a significant number of positions because there were no exertional limitations. *Id.* The VE explained there were about 200 different job titles at the sedentary level; 4,300 jobs at the light level; 2,000 jobs at the medium level; and 1,000 to 2,200 jobs at the heavy level. *Id.* at 29-30. As specific examples, the VE identified the positions of almond blancher, flumer/ potato washer, vegetable harvester, and icer. *Id.* at 30.

Finally, the ALJ asked the VE to consider an individual with "a poor ability to relate to others and supervisors in the workplace," who was "unable to complete a normal workday without psychological interruptions." (Doc. 16-3 at 30). The VE concluded there would not be any jobs available. *Id.*

### C.     The ALJ's Findings

Pursuant to the five-step process, the ALJ determined Plaintiff had not engaged in substantial gainful activity since the alleged onset date of April 2, 2007. (Doc. 11-3 at 12). Next, the ALJ found Plaintiff's schizoaffective disorder and mood disorder were severe impairments, which did not meet or medically equal a listing. *Id.* After considering "the entire record," the ALJ determined Plaintiff had the residual functional capacity ("RFC") "to perform a full range of work at all exertional levels but with the following nonexertional limitations: limited to simple, repetitive tasks with one and two-step job instructions win no interaction with the public and limited interpersonal contact on the job." *Id.* at 14. With this RFC, Plaintiff was unable to perform past relevant work. *Id.* at 16. However, the ALJ determined that there are jobs in significant numbers in the national economy that Plaintiff could perform. *Id.* at 17. Therefore, the ALJ concluded Plaintiff was not disabled as defined by the Social Security Act. *Id.* at 18.

///

## DISCUSSION AND ANALYSIS

The only alleged error identified by Plaintiff is the ALJ's evaluation of the opinion of Dr. Damania. Specifically, Plaintiff contends "the ALJ committed reversible error by failing to properly consider[] the examining psychiatric opinion of Shireen Damania, M.D." (Doc. 17 at 3). According to Plaintiff, "the ALJ failed to articulate a legally sufficient rational" to reject the opinion." *Id.* at 6.

In this circuit, cases distinguish the opinions of three categories of physicians: (1) treating physicians; (2) examining physicians, who examine but do not treat the claimant; and (3) non-examining physicians, who neither examine nor treat the claimant. *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1996). Nevertheless, a physician's opinion is not binding upon the ALJ, and may be rejected whether or not the opinion is contradicted by another. *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989). When there is conflicting medical evidence, "it is the ALJ's role . . . to resolve the conflict." *Allen v. Heckler*, 749 F.2d 577, 579 (9th Cir. 1984). An ALJ may reject the contradicted opinion of a physician with "specific and legitimate" reasons, supported by substantial evidence in the record. *Lester*, 81 F.3d at 830; *see also Thomas v. Barnhart*, 278 F.3d 947, 958-59 (9th Cir. 2002).

**A.    The ALJ set forth specific and legitimate reasons supporting her determination.**

In this case, the ALJ gave little weight to the opinion of Dr. Damania "because it is inconsistent with her findings that the claimant had normal attention span and concentration, intact memory, and could do simple calculations." (Doc. 11-3 at 15). The ALJ observed the opinion was "inconsistent with the claimant's activities including taking care of her own personal hygiene without assistance, watching television, and shopping with her spouse." *Id.* Significantly, the Ninth Circuit has determined a medical opinion may be rejected where there is incongruity between a doctor's assessment and his medical records. *See Tommasetti v. Astrue*, 533 F.3d 1035, 1041 (9th Cir. 2008). Likewise, the opinion of a physician may be discounted where it is inconsistent with a claimant's level of functioning. *See, e.g., Rollins v. Massanari*, 261 F.3d 853, 856 (9th Cir. 2001). As a result, the ALJ identified specific and legitimate reasons for giving less weight to the opinion of Dr. Damania.

**B.    The ALJ's decision is supported by substantial evidence.**

In this case, the ALJ incorporated the evaluation of Plaintiff's treating physician into the RFC by limiting Plaintiff "to simple one to two-step instructions, no public contact, and limited

interpersonal contact on the job." (Doc. 11-3 at 15).  Notably, as a general rule, the opinion of a treating physician is entitled to greater weight than the opinion of an examining physician.  *Lester*, 81 F.3d at 830.  Specifically, the Regulations provide: "we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s)."  20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).  Consequently, the opinion of Dr. John Middleton is substantial evidence.

Moreover, the opinion of non-examining physicians may be substantial evidence in support of a disability determination "when the opinions are consistent with independent clinical findings or other evidence in the record."  *Thomas*, 278 F.3d at 957; *Tonapetyan v. Halter*, 242 F.3d 1144, 1449 (9th Cir. 2001).  Here, the opinions of Dr. Lucila and Dr. Middleton, who concluded Plaintiff could perform simple, repetitive tasks with limited public contact, were consistent with the opinion of Dr. Middleton.  Accordingly, the opinions of Dr. Lucila and Dr. Middleton are substantial evidence supporting the ALJ's evaluation of the medical evidence.

## CONCLUSION AND ORDER

For all these reasons, the ALJ's identified specific and legitimate reasons supporting her decision to give less weight to the opinion of Dr. Damania.  In addition, the opinions of Plaintiff's treating physician and the non-examining physicians are substantial evidence in support of the ALJ's decision.  Therefore, the ALJ's determination that Plaintiff is not disabled must be upheld because she applied the proper legal standards.  *See Sanchez*, 812 F.2d at 510.

Accordingly, **IT IS HEREBY ORDERED**:

1. The decision of the Commissioner of Social Security is **AFFIRMED**; and
2. The Clerk of Court **IS DIRECTED** to enter judgment in favor of Defendant Michael J. Astrue, Commissioner of Social Security, and against Plaintiff Kirsten Wilson.

IT IS SO ORDERED.

Dated:   **September 5, 2012**                        /s/ Jennifer L. Thurston
                                                                       UNITED STATES MAGISTRATE JUDGE